VACUUM CLEANER CO. v. BISSELL CARPET SWEEPER CO.

(District Court, S. D. New York.  March 30, 1917.)

PATENTS ☞328—INFRINGEMENT—VACUUM CLEANER.

The Kenney patent, No. 847,947, claim 4, for a vacuum cleaner, "comprising a suction chamber provided with a narrow inlet slot, the slot being bounded and defined by lips which lie in the contact surface of the cleaner," *held* infringed by a cleaner having a narrow inlet slot, the ends of which are $20/1000$ and the middle section $45/1000$ of an inch above a plane hard surface, but which depends for its successful operation upon the vacuum principle of the Kenney invention.

In Equity.  Suit by the Vacuum Cleaner Company against the Bissell Carpet Sweeper Company.  On final hearing.  Decree for complainant.

Charles Neave, William G. McKnight, and Frank C. Cole, all of New York City, for plaintiff.

Fred L. Chappell, of Kalamazoo, Mich., and Drury W. Cooper, of New York City, for defendant.

MAYER, District Judge.  The validity of the patent is not attacked, and, indeed, cannot be, in view of the recent decision of the Circuit Court of Appeals for the Second Circuit in Vacuum Cleaner Co. v. Innovation Electric Co., 239 Fed. 543, —— C. C. A. ——.  The sole question is whether the two devices of defendant, known as "Bissell's Vacuum Sweeper" and "Bissell's Superba," infringe claim 4; these devices being the same for the purposes concerned in this suit.

Claim 4 reads as follows:

"4. A cleaner comprising a suction chamber, provided with a narrow inlet slot, the slot being bounded and defined by lips which lie in the contact surface of the cleaner, with the outward mouth of the slot lying in the plane of this contact surface, substantially as described."

This claim, which was discussed in Vacuum Cleaner Co. v. American Rotary Valve Co. (D. C.) 227 Fed. 998, and Vacuum Cleaner Co. v. Innovation Electric Co. (D. C.) 234 Fed. 942, affirmed 239 Fed. 543, —— C. C. A. ——, relates solely to the cleaning tool.  Defendant's tool is mounted on a box provided with two sets of wheels; the rear wheels being utilized to operate bellows inside the box, while the forward wheels are mounted on springs.  The cleaning tool, which is carried at the forward end of the box, consists of a curved sheet of metal in the median line of which is cut a narrow slot extending nearly all the way across from one end of the tool to the other.  The testimony is that the instructions at defendant's factory are to adjust this cleaning tool or nozzle, so that the ends of the slot are $20/1000$ of an inch above a plane hard surface, and the middle section thereof are $45/1000$ of an inch above such surface.  There is no reason to doubt that the manufacture of defendant's device has been undertaken and completed in this way with a view of escaping claim 4 of the Kenney patent, and of

following, according to defendant's contention, the teachings of the art prior to Kenney.

Defendant, for many years, has had and continues to have a very successful business in the manufacture and sale of a hand-operated carpet sweeper. In response, however, to extensive and persistent demands from customers, defendant in December, 1913, undertook the manufacture of its alleged infringing devices, and thereafter began the development in its factory of these devices, until in November or December, 1914, it placed them on the market. See Domestic Vacuum Cleaner Co. v. Bissell Carpet Sweeper Co., 242 Fed. ——, decided March 20, 1917. The exceedingly slight distance which is represented by either $20/1000$ or $45/1000$ of an inch can best be appreciated by observing the marking on an ordinary foot rule, and the result is that one's first impression is that the raising of the slot above a plane hard surface to this trifling extent is merely a colorable expedient for the avoidance of obvious infringement. In view, however, of the elaborate experiments testified to by defendant's expert, and the demonstrations before the court, as well as the careful analysis of the prior art, it soon became evident that the defendant had entered upon the manufacture of its devices with the conviction, or at least the hope, that Kenney's claim 4 had been honestly and actually avoided, and the case is therefore worthy of careful consideration.

The history of previous litigations in this district shows that Kenney's patent took its first commercial form in large installations of the character considered and described in the American Rotary Valve Case, where there was a high vacuum produced by a positive displacement pump; next came the hand electrically operated devices, abundantly illustrated in the Innovation Case, where a lower vacuum was produced by a rotary fan; and finally the small compact pneumatic type of carpet sweeper, with much lower vacuum, exemplified in the three cases recently tried in this court, viz. National Sweeper Co. v. Bissell Carpet Sweeper Co., 242 Fed. 947, M. S. Wright Co. v. Bissell Carpet Sweeper Co., 242 Fed. 950, and Domestic Vacuum Cleaner Co. v. Bissell Carpet Sweeper Co., 242 Fed. 943. Defendant, therefore, was confronted with the problem of manufacturing and marketing a device, efficient for its purposes, which would meet this popular requirement for the "vacuum" idea; and the appreciation of that requirement is well evidenced by defendant's advertisements, in which it refers to its "hand vacuum cleaners," which draw "all the dirt and dust which have been ground into rugs and carpets into an air-tight dust bag," and remove "every particle of dust and grit," and effect "a thorough renovation."

Notwithstanding the vigorous defense industriously prepared, the case really comes down to a single point, because the other controverted questions are either readily disposed of or have been settled by decisions in this circuit and district after sharp contest and searching and detailed consideration. It may very well be that a phrase here and there in previous opinions may be made the subject for elaborate discussion; but, in order to determine what is decided, it is always necessary to ascertain what the vital points of the controversy were, and,

with that guide in mind, it seems quite clear that the following propositions are the established law in this circuit in respect of the Kenney patent, and more especially of claim 4 here in controversy:

1. Plaintiff "is entitled to have a broad interpretation given to the claims of the patent." See opinion in the Innovation Case. See American Rotary Valve Co. Case (D. C.) 234 Fed. at page 943.

2. Claim 4 does not specify nor require that there shall be "projecting" lips. This point, while not discussed in the opinion in the Rotary Valve Case, was, however, so strongly urged in the Innovation Case that it was referred to in the opinion reported in 234 Fed. at page 945, and is carefully dealt with from a somewhat different point of view in the opinion of the Circuit Court of Appeals.

3. While the meaning of "narrow" inlet slot was and may be an important point of controversy in a case like the Innovation Case, there cannot conceivably be any construction of claim 4 of the patent which could transform an obviously "narrow" slot, such as is found in defendant's device, into something which was not a "narrow" slot. In this connection the much-discussed disclaimer of claim 2 may be briefly referred to.

With the word "narrow" omitted from that claim, it was quite clear that the prior art was not escaped. The expression "unobstructed elongated slot" might readily comprehend several patents of the prior art, and more especially Cummings and C. J. Harvey. This seemed so clear that it was called to the attention of counsel from the bench and the point was thereupon practically conceded. To have held this claim valid would have precluded the use of a device such, for instance, as that of Cummings, if anybody were foolish enough at this time to try to give Cummings commercial embodiment.

From the foregoing it will be seen that the single point now requiring discussion is whether the slot of defendant is capable of contact or sealing with the surface to be cleaned in the sense of claim 4, construed, as it must be, in the light of its context; for defendant's device, in any event, comprises (a) a suction chamber, (b) provided with a narrow inlet slot, (c) the slot being bounded and defined by lips which lie in the surface of the cleaner, with the outward mouth of the slot lying in the plane of this surface.

We may at once put out of view models such as those of McGaffey and Hall, because the forward lip is well above the surface, and the theory of these devices negatived contact, and was in direct contradiction to Kenney's teaching. The Howard and Taite patent, with its arc-like shape, likewise clearly negatived contact. In the American Rotary Valve Case there was some dispute as to the correctness of plaintiff's model of Howard and Taite, but the conclusion there arrived at has now been fully confirmed. The view of the court in that case (227 Fed. at page 1001) need be repeated only to call attention again to the statement in the specification that the "inlet" is moved "over and near to the surface. * * *" Without desiring to treat slightingly the earnest argument in respect of the C. J. Harvey patent, I think a reading of the patent and a mere inspection of the model in evidence will demonstrate that it taught nothing whatever, and, in any

event, did not teach the desirability of a sealing contact. In the previous cases the various patents cited were examined, but some were of such small consequence that they were not mentioned in the opinions; for it is neither practicable nor desirable that every patent referred to in a litigation should be discussed or mentioned. So, in this case, reference is made only to those patents or models which seem either to be worthy of discussion or upon which counsel have laid special emphasis.

Thus, finally, we are brought to the consideration of the C. J. Harvey patent. It is said that this patent latterly has had some commercial exemplification in devices used for cleaning small areas, such as the floors of Pullman cars and stairs and passageways. What has been done to make the C. J. Harvey device practicable does not appear, nor is it relevant to this controversy. The question, of course, is what C. J. Harvey had disclosed to the world when Kenney filed his application in the Patent Office. As an entirety, the C. J. Harvey device, as illustrated in the patent and by the model in evidence, is hopeless and impracticable. I doubt whether anybody but a Sandow could operate it continuously for 10 minutes. The question is, then, whether the C. J. Harvey nozzle is the lineal ancestor of defendant's nozzle. If we turn from the model to the patent, we find the answer. In the specification C. J. Harvey states.

"I actuate a pump by the actions of applying and removing the apparatus to and from the articles to be dusted, and I *mount the nozzle or duster* on the movable part of the pump, which may be single or double acting, while the stationary part of the pump serves as a handle, or has a handle fixed to it."

The two claims of the patent carry out this idea, and the drawings and the model show the two rollers on each end of the nozzle adjacent to the slot. In other words, what Harvey taught was the elevation by means of rollers of a nozzle above the surface to be cleaned. This is but another way of saying that he wanted to make quite certain that the nozzle would not contact with the surface to be cleaned, and that he described means which would clearly prevent contact of the nozzle with the surface. He did not point out that the slot should be narrow, although, if that had been his conception, it could readily have been reduced to simple language. In other words, his theory was the direct opposite to that entertained by Kenney, and this was recognized in the American Rotary Valve Case, 227 Fed. at page 1002.

Of course, as has been said many times, the later art can be readily availed of by ingenious men to reduce the imperfections of the prior art to a greater or less extent, and this is illustrated by the C. J. Harvey model in evidence, where the slot is made very narrow, and the rollers only very slightly below the level of the slot, and yet I am satisfied, in view of the then state of the art and the direction towards which inventors' minds were tending, that nobody on July 30, 1900, the date of the C. J. Harvey application, would have thought of making the model in evidence to exemplify the Harvey patent; but, be that as it may, defendant, in any case, does not construct its devices in accordance with this C. J. Harvey model.

From the foregoing it appears that there is nothing in the prior art which can justify the nozzle structure of defendant as against claim 4 of the Kenney patent, if, in point of fact, defendant's device contacts with the surface to be cleaned, and if it be assumed that infringement can be found, notwithstanding that the vacuum attained by defendant's device when in operation is very low and inefficient as compared with the best exemplification of Kenney.

There is no doubt that Kenney had in mind a very effective device, calculated to extract dirt from beneath the surface, and inter alia to force air to penetrate the fabric at the suction nozzle. The history of the art may readily lead to the conclusion that Kenney's attention was especially turned to the use of his system and apparatus in large installations. It is, however, the settled and beneficent principle of the patent law that a patentee is entitled to all the results which may flow from his invention, even though he has not possessed the prophetic vision to forecast all the uses to which it may be put. Indeed, the fact that an invention is used in a larger field and in more diversified directions than the inventor himself contemplated is a high tribute to the character of the invention. Keen-minded men, alive to commercial possibilities, saw how this invention could be utilized for electrically operated devices in the household or the office suite. Equally keen-minded men saw encouraging commercial prospects for the manufacture and exploitation of small hand-operated devices with smaller motive power, where the amount of the vacuum would depend to some extent upon the power of a human being's arm. Kenney, by accident or design, was fortunate enough to frame a claim which had to do solely with the cleaning tool, and the claim must be construed as having been framed in contemplation of the possibility that some one thereafter might be able to devise an instrumentality which would avoid claims 1, 2, and 3, and yet employ an operative cleaning tool, which would not stick, but would so contact as to localize at a narrow slot such vacuum as might be created—and this is what sealing contact means. No device in the prior art is more instructive as to the difficulty of the problem than that of Cummings; for when the Cummings hood was in contact it stuck, and would not work, and when it was not in contact it was capable only of taking up shavings and surface litter. Therefore Kenney was dealing with a problem which concerned, not merely the creation of a vacuum theoretically, but the production of an operative tool. The gist of the invention is stated in the opinion of the Circuit Court of Appeals, as follows:

"It was demonstrated at the trial that a vacuum properly localized at a narrow slot results in the most complete elimination of dirt and dust. The narrower the slot, the more completely this is done. The defendant's devices, having wider slots than the complainant's, do not remove dirt which is seated deeply in the fabric as well as do complainant's cleaners. Nevertheless they operate in the same way. In view of the state of the art at the time Kenney applied for his patent, it can fairly be said that he taught it the value of a narrow slot, which could be readily moved without sticking to the carpet, or causing abrasions of the carpet, and of a sealing contact. The defendant's devices all do this. They can be prevented from sticking to the carpet by decreasing the vacuum which complainant uses. This renders the device less efficient, but still efficient enough to remove considerable dirt. It operates in exactly the same way as complainant's, only less well."

Just as, in the Innovation Case, it was not possible within the limits of an opinion to analyze the testimony and experiments of the experts, so in this case it is enough to state that the result of the experiments satisfies me that defendant's device makes contact with the carpet more or less efficiently dependent upon the man power exerted and the yielding or soft character of the carpet. In other words, the testimony and experiments demonstrated that there was contact whereby a low vacuum was localized at "a narrow slot." The slipping of a card under defendant's device when resting on a carpet is an elusive test, and the one experiment, unexpected and accidental, which supported the contention of plaintiff and its expert, in this regard, was that at Warren street, where the card could be slipped under more easily in one direction of the carpet than in another. This illustrated the proposition, insisted upon by plaintiff, that the ability to slip a card in between the lips of the tool and the carpet was not due to lack of contact, but to the depression of the fibers of the carpet; the point being that the nap of the carpet is such that it naturally resists depression when force is exerted in one direction more than when exerted in the other direction. The static experiments of Prof. Reeve showed that defendant's nozzle contacted with the carpet; and the testimony of Mr. Allington was that "the cleaning effect is somewhat beneath the surface, but not very far below; the strength of the vacuum is too weak to go very far below."

Of course, it is very difficult indeed for plaintiff or defendant to prove beyond a reasonable doubt their respective contentions as to the actual working of the device when operated by human hands; but the construction of the forward wheels, with their tendency to sink into the carpet, the vertical thrust, and the selection of a height above the plane hard surface, almost infinitesimal, all combine to resolve any doubt that might be entertained in respect of contact. Indeed, recurrence may be had to the well-worn inquiry: If contact were not necessary for an efficient device, why not raise the slot at a height sufficiently above the carpet to leave no doubt in any one's mind that there could not be contact; or why not widen the slot to an extent where, in relation to the suction means and the power exerted, the action would clearly be on the air current theory, without the suggestion of a vacuum? The answer, of course, is that, if either of these structures and methods were adopted, defendant's device could not live commercially. It is fair to assume that at least part of the period between 1913 and November and December, 1914, was spent by defendant in endeavoring by experiment to ascertain how close to a plane hard surface the slot could go without infringing the claim of the Kenney patent here in issue.

In view of the breadth which the Circuit Court of Appeals has accorded to this patent and this claim, and of the fact that in that court and this it has been held that there is not a limiting requirement of a high vacuum, it follows that defendant's devices infringe, if in point of fact the lips of the slot contact with the surface and such vacuum as is created is the result of the adoption of the same construction and the same means as were employed by Kenney in the cleaning tool set forth in claim 4. As the structure is obviously the same, and on the

evidence the contact takes place in the same way, although, because of the nature of these hand sweeper devices, less efficiently, claim 4 is infringed, and the plaintiff may have a decree accordingly.

Settle decree on five days' notice. As defendant has been successful on one claim, the. e will be no costs. Owing to the responsibility of defendant, the injunction will be suspended on moderate terms, provided the appeal, if any, shall be promptly taken and prosecuted.